Argued and submitted August 8, 2003, affirmed February 25, 2004

JoAnn MOSES,
Francene Moses Ahern, Victor Moses,
William Moses, Joseph Moses,
Oliver Moses, George Moses,
Scott Moses, Jake Suppah,
Chason Walker, and Eugene Danzuka,
*Appellants,*

*v.*

Brenda KALAMA-SCOTT,
Byron Kalama, Merle D. Kalama-Thompson,
Murray Kalama, Thomas O. Kalama,
Rebecca Kirk, Ronald Kalama,
Cecil Tulee, Sr., Patricia Tulee,
Maria Tulee, Clifford Barney Tulee, Jr.,
Leonard Peter Tulee, Francis Tulee,
Jessie Tulee-Hill, Loretta Tulee,
Marjorie Kalama-Danzuka, Naome Kalama-Winishut,
Celeste Kalama-Whitewolfe, Julie Kalama-Quaid,
Judy Kalama-King, Gilbert Kalama,
Carl S. Kalama, Simon Kalama,
and Margie Kalama-Gabriel,
*Respondents.*

98CV 003133; A117071

84 P3d 1097

David W. Hittle argued the cause and filed the brief for appellants.

No appearance for respondents.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

This action to quiet title under ORS 105.605 involves real property known as "allotment 285," which consists of 120 acres on the Warm Springs Indian Reservation. Plaintiffs appeal two judgments of the trial court and argue that the court erred when it (1) granted defendants' motion for a directed verdict against plaintiffs' adverse possession claim and (2) granted summary judgment against plaintiffs' full faith and credit claim. Plaintiffs contend that the court should have either given full faith and credit to a judgment of the Confederated Tribes of Warm Springs Tribal Court, which awarded allotment 285 to plaintiffs, or should have denied defendants' motion for a directed verdict. We affirm.

We state the facts in the light most favorable to plaintiffs. *Harris v. Pameco Corp.*, 170 Or App 164, 166, 12 P3d 524 (2000) (standard of review for grant of directed verdict); *Johnstone v. Zimmer*, 191 Or App 26, 28, 81 P3d 92 (2003) (standard of review for grant of summary judgment).

One of the defendants, Marjorie Kalama-Gabriel, is the great-granddaughter of Lillie Pitt Kuckup. Allotment 285 belonged to Lillie's daughter, Mary Kalama, who died in 1901. Lillie's ex-husband, Peter, inherited allotment 285 from Mary and subsequently deeded the land to Lillie. In 1920, Lillie was awarded allotment 285, in fee, by the federal government and died soon thereafter. In 1924, Lillie's seven surviving children[1] inherited equal shares (one-seventh interest each) of allotment 285.

Marjorie testified that, before she was born, her father, mother, and three sisters lived in a structure called the "Spring House" on allotment 285. Marjorie's family moved from allotment 285 in approximately 1955, and neither she nor any of her family members have paid taxes on or used the property since then. Marjorie testified that her uncle, Nick Kalama, built a deteriorating "foundation" on

---

[1] Lillie's surviving seven children were Oliver Kalama, Naomi Wagner, Francis Kalama, Esther Hicks, Henry Kalama, Irene Jackson, and Gilbert Kalama.

allotment 285 but that she did not remember when it was built.

Joseph Moses, one of the plaintiffs, testified that plaintiffs are the rightful owners of allotment 285 because Joseph's mother, Kathleen Moses, adversely possessed the property. Nick and Kathleen are brother and sister. Kathleen leased the property for five years beginning in 1960. A letter from the Warm Springs Agency addressed to Nick stated, in part:

"Lease No. 1570 and Lease No. 1571 were drawn in favor of Oscar Moses, now deceased, and Kathleen K. Moses. The leases were drawn to cover farm operations on Warm Springs Allotment No. 273, Charles Pitt, [deceased] and Warm Springs Allotment No. 285, Mary Kalama, deceased.

"The lease was drawn for a five year period and will expire February 28, 1965. * * *

"You hold an undivided 1/35 interest in each of the allotments."

Joseph testified that his mother, Kathleen, paid the property taxes on allotment 285 until 1983 when the Oregon Department of Justice, Tax Division, issued an opinion stating that the property was exempt from taxation. Kathleen built a home in the late 1970s that was outside of the allotment 285 boundaries. Joseph said that the only reason that Kathleen did not build a home on allotment 285 was because it was not economically feasible. Joseph said that allotment 285 is considered state land, not tribal land, and the tribe would not lend Kathleen any money to build on state land.

Joseph lived on the reservation from the time that he was born until he went to high school. After high school, he moved back to the reservation and has lived there for approximately 40 years. Joseph testified that his parents lived, ranched, and farmed on allotment 285. The farming occurred on approximately five or ten acres and ceased after his father passed away in 1960, but both Joseph and Nick "wintered" their cattle in that area until 1975 when Nick relocated his cattle. Depending on the weather, the cattle would arrive in October and stay on the property until March. The main area

where the cattle were kept was not on allotment 285, but the cattle were "open range" and Joseph "left the gates open for them to graze wherever they wanted." Joseph continued to use the property for cattle, and he also kept saddle horses there, all year long, from approximately 1975 until 1995. The horses would also go outside of the fenced area and would wander onto allotment 285 to graze. It is undisputed that no one except Joseph, Joseph's family, and Nick used the property after 1960.

Joseph said that his mother, Kathleen, knew that he was using allotment 285 and that, to his knowledge, she had no objection to his actions. He also said that Kathleen knew about and had no objection to Nick's actions regarding the property.

Joseph testified that Nick's foundation and the Spring House were not located within the boundaries of allotment 285. Joseph also said that there is a "cross-fence" on allotment 285, and he testified that he used to repair it "almost every year." He replaced the posts after a fire in 1993. Subsequently, the posts were stolen and he replaced them again. Joseph testified that the last time he was on the property to repair the fence was in 1995. The fence is the only structure on the property.

Joseph said that, in approximately the late 1980s or early 1990s he had to assist his mother, Kathleen, in diverting a spring that ran near the house because her house was not stable. Otherwise, the water could have destroyed her house. In order to divert the spring, Joseph said that he had to move dirt from within allotment 285.

Plaintiff JoAnn Moses testified that her mother, Kathleen, was a 4-H leader in the 1980s and that Kathleen and the 4-H members used allotment 285 to gather roots and vegetation in order to make crafts. JoAnn said that, independently of the 4-H group, Kathleen used the property for her own crafts year-round. JoAnn said that, when Kathleen got older, she would commission her children to go with her to allotment 285 and assist her in gathering things like pine needles for her various crafts. JoAnn said that her mother used the property from approximately 1960 until 1996 for her crafts, although Kathleen did not exclusively use allotment

285 for that purpose—she also went into surrounding areas to gather craft materials.

Kathleen died in 1997 and, in August 1999, the Warm Springs Tribal Court issued a final order awarding a one-eighth interest in allotment 285 to each of Kathleen's eight children: JoAnn, Victor, William, Joseph, George, Oliver, Francene, and Eugene. Kathleen's children and grandchildren are the plaintiffs who filed a complaint seeking to quiet title to allotment 285. An amended complaint alleged two counts, the first alleging adverse possession and the second requesting that the court afford full faith and credit to the Warm Springs Tribal Court decision. Count one alleged that (1) Lillie was the fee owner of allotment 285 since 1920; (2) Kathleen, Lillie's granddaughter, "had open, hostile and exclusive possession of [allotment 285] continuously for more than twenty years under claim of right [and] possession of such property was in no other. ORS 105.605 and ORS 105.615"; (3) Kathleen died in 1997, so allotment 285 vested in her heirs; (4) defendants have no legal interest in allotment 285; and (5) "[p]laintiffs have no plain, adequate or speedy remedy at law and therefore [bring] this suit in equity." Count two alleged that allotment 285 was awarded to plaintiffs by the Warm Springs Tribal Court.

On April 18, 2001, defendants filed motions for summary judgment on both counts. The trial court denied defendants' motion for summary judgment regarding the adverse possession claim but granted it with regard to the full faith and credit claim. The court issued a letter opinion on June 25, 2001, explaining that it denied

"giving comity to the Warm Springs Tribal Court's probate judgment in regards to [Kathleen's] estate. It is clear that no notices were sent to the party defendant as adverse claimants to the Kathleen Moses estate's claim. That is the subject of the litigation in this case. The notices that were given were notices that were posted in three separate locations on the Warm Springs Reservation as to the estate. That case did not provide due process to the party defendant regarding ownership of the parcel in dispute."

On November 6, 2001, plaintiffs tried their adverse possession claim to the court. After plaintiffs rested, defendants moved for a directed verdict, arguing that plaintiffs

had not made a *prima facie* case of adverse possession. In its oral decision, the court granted defendants' motion for a directed verdict and explained that

"the heirs of [Kathleen] * * * are relying on her possession of this property on an adverse basis under a state statute. It's not a claim under Joseph Moses' occupation of this property, but under Kathleen Moses'.

"* * * * *

"* * * we know that there was no non-exclusive possession of this property * * * until 1975 when Nick Kalama moved his cattle off of the property. So, the time that's been referred to * * * is from 1975 to 1995. * * *

"It seems to me that the [p]laintiffs' claim pretty much relies on Joseph Moses'[s] continual contact with this property from 1975 and there's a little question because of where he was and where he was working, until 1995 as to that continuous period of adverse possession under the statute. * * *

"* * * the complaint sets forth that the claim of the [p]laintiff[s] relies on the claim of Kathleen Moses, and not on her son. * * * But it seems to me that * * * the [p]laintiff[s] [have] not met [their] burden of proof * * * and since there is * * * no tacking allowed * * * I cannot find that there has been exclusive possession * * * by Kathleen Moses.

"* * * * *

"On the record * * * in front of me, I'm making a finding that there was no specific agreement. * * * [Kathleen] had no objection, at the time that Mr. Moses and Mr. Kalama went and put their cattle on the property, which isn't the time that we're talking about anyway because this was not the time of exclusive possession. It was from approximately * * * 1960 to 1975 there [were] co-tenants on the property. There were two people claiming right to the property or at least utilizing the property during that period of time."

The trial court based its ruling on two alternative reasons. It concluded (1) that plaintiffs' evidence did not make a *prima facie* showing that Kathleen actually permitted (as opposed to merely acquiesced in) her children's use of the property and (2) that, even if Kathleen had permitted or

authorized such use, such authorized use by a third person who is not the cotenant's agent (and there is no suggestion in this record that Kathleen's children were acting on Kathleen's behalf) is not sufficient to establish exclusive use by the "authorizing" parties.

■ We begin with plaintiffs' second assignment of error because, if plaintiffs prevail on their full faith and credit claim we need not address their first assignment of error. At oral argument, counsel for plaintiffs essentially conceded that we cannot determine whether the trial court erred when it granted defendants' motion for summary judgment because the notice of the Warm Springs Tribal Court proceedings that was posted is not part of this record and because we cannot, from this record, discern the content of that notice. Counsel for plaintiffs conceded that, given those facts, this court cannot determine whether the notice comported with due process and that this court cannot, therefore, make a reasoned decision regarding plaintiffs' second assignment of error. On this record, we cannot say that the trial court erred in granting defendants' motion for summary judgment.

■ We turn to plaintiffs' first assignment of error— whether the trial court erred when it granted defendants' motion for a directed verdict. For the reasons that follow, we conclude that plaintiffs' arguments, as set out in their brief on appeal, were waived in the trial court.

On appeal, plaintiffs argue that, when the trial court granted defendants' motion for a directed verdict, the trial court relied on *Willson v. Hessong*, 38 Or App 269, 589 P2d 1194 (1979), which is no longer good law. Plaintiffs argue that *Willson* concerned a prior version of ORS 105.615, which, at that time, did not allow tacking. ORS 105.615 was amended in 1989 to allow tacking. Or Laws 1989, ch 1069, § 3. Plaintiffs argue that the use of the property by Kathleen "and her children is consistent with that to which a reasonable person would use it. The element of possession has been established." Plaintiffs also argue that all of the elements of adverse possession under ORS 105.615 have been satisfied due to the actions of both Kathleen and her children.

Before the trial court, counsel for plaintiffs argued that

"one of the exercise[s] of control of the property that we're talking about here is a mother exercising her control of the property to allow one of her children to use it. That's her exercise of control. If I own a piece of property, I have the right to designate who may or may not use the property. In this instance, *we're not trying to say that [Joseph] has tacked some use onto his mother's use. We are saying that by his use of the property, it was an exercise of control of the property by his mother.*"

(Emphasis added.) Later, when the court was explaining its decision, counsel for plaintiffs said, "Just so the Court understands, our position on [Joseph] using the property *wasn't tacking*, it was at the authorization of the apparent owner, his mother." (Emphasis added.) The court responded, "I understand that[.]"

We therefore decline to consider plaintiffs' first assignment of error because the argument on which it relies, tacking, was expressly waived by plaintiffs before the trial court. We therefore affirm. ORAP 5.45.

Affirmed.